IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **HARLAND CREAL,**<br><br>        **Plaintiff,**<br><br>    v.<br><br>**SPRINGHILL FORD, INC.,** an Illinois Corporation, and **MIKE CRETSINGER,** Individually,<br><br>        **Defendants.** | **Case No. 06 C 0175**<br><br>**Hon. Harry D. Leinenweber** |

## MEMORANDUM OPINION AND ORDER

Plaintiff Harland Creal (hereinafter, "Creal") brought this action against Defendants Springhill Ford (hereinafter, "Springhill") and Mike Cretsinger (hereinafter, "Cretsinger") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and 42 U.S.C. §§ 1981, *et seq.* ("Section 1981"), alleging race discrimination and retaliation arising from the termination of Creal's employment with Springhill. Before the Court is Defendants' Motion for Summary Judgment. For the following reasons, the motion is **granted**.

### I. BACKGROUND

The Court derives the following factual summary from the parties' Local Rule 56.1 submissions. The Court recounts only those facts relevant to the resolution of the instant motion and notes where facts are disputed. Additionally, because this is a

summary judgment motion, the Court views all facts in the light most favorable to Creal, the non-movant.

Defendant Springhill employed Creal, who is African-American, as a car salesman from July 2004 until May 2005. During roughly the same period of time, Springhill employed Defendant Cretsinger, who is Caucasian, as a Sales Manager. Cretsinger was one of Creal's direct supervisors.

The incident that led to Creal's termination occurred on May 10, 2005, after Creal arrived late for his 1:00 p.m. shift. According to Creal, he had called in at around 11:30 a.m. that day to tell one of the Sales Managers that he might be a little late. He testified that no manager was then available to speak to him, so he left a message with the receptionist. According to Creal he then ran out of gas while driving to Springhill for his shift, which delayed his arrival there until approximately 1:45 p.m. Creal testified that upon arriving at Springhill he acknowledged to Cretsinger that he had arrived, spoke to another salesmen regarding his tardiness, and went to his desk. According to Creal, the following then occurred:

> I started prepping for the day and Cretsinger paged me up to the tower, asked me why I was late, I pretty much told him that I had called in, that I had been in Joliet, that no one was at the sales desk, but I let the receptionist know to let one of the managers know that there was a chance that I would be late; and he proceeded to say to me something to the effect that I'm not going to put up with your f---in' sh-t, and my comment to him was

>   basically why was he getting on me about
>   something like that because this happens
>   basically every day and was it because I was
>   the only black salesman here he felt the need
>   to say something to me.
>
>   His comment after that was get your sh-t and
>   get out. I asked him are you firing me? He
>   said yes. Get your sh-t and get out of here.

Although the fact of this confrontation is undisputed, other witnesses recounted the details differently. Cretsinger testified that Creal arrived between two and three hours late for his shift, and that his discussion with Creal about it unfolded as follows:

>   I asked Harlan why he was late and Harland
>   said he had to get his hair cut and he had
>   some car problems, and I asked him, I said,
>   "Well, why wouldn't you call and let me know
>   that you were going to be late," and I said,
>   you know, "You told me you were going to get
>   your hair cut, couldn't you do this on your
>   day off or couldn't you do this before your
>   shift?"
>
>   And his exact words were, "I'm tired of you
>   mother f---ers riding me," and I said, "What
>   did you say?", and once again he said to me,
>   "I'm tired of you mother f---ers riding me,
>   I've got car problems," you know, and at that
>   time I could smell alcohol on his breath, and
>   I said, "You know what? I want you to pack
>   your stuff and go home for the day. I don't
>   need you today." His exact words were, "F--k
>   you. I don't have to answer to you."
>
>   And at that time I told him to pack his sh-t
>   and get out, he is no longer employed here at
>   Springhill Ford.

According to Hideyasu Caszatt, a salesmen seated near Creal's desk, Creal arrived two hours late that day and went right to his desk. Caszatt testified that Cretsinger then called Creal up to

the "tower" and asked Creal why he was late. According to Caszatt, Creal responded that he did not have to report to Cretsinger, to which Cretsinger said, "yes you do, go home for the day." Caszatt testified that Creal then told Cretsinger, "I don't have to f---ing leave," and shortly thereafter became belligerent and loud, using the "F" word and saying "something about Mr. Cretsinger's mother." It was at this point, according to Caszatt, that Cretsinger fired Creal. In Caszatt's account, Creal then yelled and swore for the next 20 minutes or so, calling Cretsinger a "fat ass" before eventually leaving. Caszatt testified that he never heard Creal say anything about Cretsinger picking on him because he is black.

The President and owner of Springhill, Randy Kalin, also testified that he was in his office on that day and heard Creal yelling and cursing out on the showroom floor, using the "F-word" and the "M-F-word" directed at Cretsinger. According to Kalin, he came out to the showroom after the incident and learned from Cretsinger that Creal had been terminated because Cretsinger believed he did not need to take abuse from his employees. Kalin also testified that he never heard Cretsinger yelling.

Underlying the May 10 incident is the issue of Springhill's tardiness policies and practices, as well as Creal's history in this regard. Springhill has a written policy requiring salespersons to report to work on time and to call into a manager ahead of time if they expect to be late or absent. Additionally,

prior to May 10, 2005, Creal had been late on at least a few other occasions and on at least some of those occasions had not spoken with a manager about it beforehand. Although Creal disputes other witnesses' testimonies that he was frequently late, it is undisputed that he was late often enough that in January 2005, Creal's other Sales Manager, Jose Santiago, "counseled" Creal and another salesman, Don Rhodes, who is Caucasian, regarding habitual tardiness. This "counseling" took the form of one-on-one meetings in which Santiago told Creal and Rhodes that it was the beginning of a new year and they should "start it out right" by not being late, and that he would not condone anyone from his group "setting a bad example" by showing up late.

According to Creal, the attendance policy was "lax" in practice, and Cretsinger simply singled his tardiness out because of Creal's race. To this end, Creal testified that Cretsinger had previously made "race-tinged" comments. First, according to Creal, in the Fall of 2004, Cretsinger told Creal that he was "the second whitest black man" that Cretsinger had ever known. Then, around the same time, Creal claims that Cretsinger asked Creal why it was okay for black people to call themselves the "N-word" but it was not okay for whites to use the word. Creal further testified that a fellow salesman later told him that he had witnessed Cretsinger using the "N-word" about another African-American. Cretsinger denied making any of these comments.

Creal also testified to another incident that he contends supports his claims. According to Creal, one Saturday morning in November or December 2004, he arrived five minutes early for a regularly scheduled sales meeting, but Springhill General Manager Bob Nelson hurried the other sales staff into the meeting room before Creal came into the building. Creal testified that Nelson then claimed that Creal was late and for that reason excluded him from the meeting. According to Creal, after the meeting, two salesmen told Creal they thought it was "not right," one salesman told Creal that Creal "had a target on [his] back," and one salesman told Creal, "they're out to get you." Additionally, Creal claims that one salesman who had just been hired quit because of the Saturday sales meeting incident.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Indiana*, 259 F.3d 619, 624 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. DISCUSSION

Creal's Complaint consists of four counts. Counts I and III allege race discrimination under Title VII and Section 1981, respectively. Counts II and IV allege retaliation under Title VII and Section 1981, respectively. Because Title VII and Section 1981 claims are predicated on the same elements, *Lalvani v. Cook County, Illinois*, 269 F.3d 785, 788 (7th Cir.2001), the Court will address both race discrimination claims together and both retaliation claims together.

### A. Race Discrimination

Federal law prohibits employers from discriminating against employees on the basis of their membership in certain protected classes, including race. *See* 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981. Federal employment discrimination plaintiffs can pursue two methods of proof: the "direct" method and the "indirect" burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 529 (7th Cir. 2003). Creal's evidence fails to satisfy the requirements of either method.

#### *1. Direct Method*

Under the direct method, Creal must show either through direct or circumstantial evidence that his termination was motivated by his race. *See id.* Creal does not offer direct evidence, so he must offer circumstantial evidence sufficient to create a

reasonable inference of racial discrimination. *See Troupe v. May Dep't. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Courts have recognized three general types of circumstantial evidence in employment discrimination cases: (1) the collective weight of "bits and pieces" evidence suggesting discriminatory motive, such as suspicious timing, ambiguous statements, and problematic behavior towards others in the protected group; (2) evidence that similarly situated employees not in the protected class received systematically better treatment; and (3) evidence that the employer's reason for a difference in treatment is unworthy of belief, a mere pretext. *See id.* Creal unsuccessfully invokes each of these three types of circumstantial evidence.

*a. Suspicious Timing and Other "Bits and Pieces" Evidence*

Creal claims the timing of his termination suggests racial discrimination because Cretsinger fired him directly following Creal's alleged question to Cretsinger about whether Cretsinger was "getting on" Creal because Creal is black. But Creal does not explain how this evidence supports Creal's race discrimination claim, as opposed to his retaliation claim, which the Court separately addresses below. The fact that Creal, not Cretsinger, raised Creal's race right before Cretsinger terminated Creal sheds no light on whether Cretsinger was acting out of racial animus.

In any case, several parts of Creal's own testimony (which is Creal's primary form of evidence) regarding the May 10 incident

undermine an inference of racial discrimination. Specifically, Creal testified that he arrived 45 minutes late, having previously been counseled for tardiness, and that Cretsinger reprimanded him after his arrival. In the Court's view, this is not a surprising action for a supervisor to take in such a circumstance. According to Creal's testimony, Creal's response to his supervisor was not to be contrite or apologetic or even just silent. Instead, Creal's response was to express irritation with Cretsinger "riding him" or "getting on him" and then ask Cretsinger whether he was racially discriminating against Creal. It is undisputed that all of this occurred in the middle of the Springhill show room and in front of other Springhill employees. The Court believes it would be more than reasonable for a supervisor in Cretsinger's position to view Creal's response as insubordination, which is a legitimate, non-discriminatory reason for terminating an employee, *Flores v. Preferred Technical* Group, 182 F.3d 512, 515 (7th Cir. 1999).

Nor does the Court find that Cretsinger's alleged "race-tinged" comments support a reasonable inference that Creal's termination was racial discrimination. The alleged comments occurred more than six months prior to Creal's termination and were not repeated. This alone renders them unavailing to Creal. *See Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 530 (7th Cir. 2003) (rejecting employee's reliance on alleged racist comments made several months prior to termination because "those comments

were not made contemporaneously with or in reference to [the plaintiff's] termination"); *see also*, *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) ("[B]igotry, per se, is not actionable. . . . [T]here must be a real link between the bigotry and an adverse employment action.").

Creal's reliance on comments and impressions relayed to him by other Springhill employees is likewise misplaced. This Court can only consider admissible evidence in considering a motion for summary judgment, *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007), and the sort of indirect recounting Creal seeks to do here would not be admissible at trial. For example, Creal's testimony that Don Rhodes told Creal that Rhodes once witnessed Cretsinger using the "N-word" about an African-American employee is hearsay. And Creal's testimony that Rhodes and others told him things like "they're out to get you" contains insufficient foundation on which to determine whether the declarant was speaking from personal knowledge. The inadmissibility of these statements is underscored by the fact that at least one of the declarants, Don Rhodes, was actually deposed in this litigation, yet Creal seeks to offer Creal's account of what Rhodes purportedly told him, rather than actual testimony by Rhodes.

Finally, Creal's testimony regarding the alleged Saturday sales meeting from which he says he was excluded is likewise unavailing. Creal testified that it was Springhill's General

Manager, Bob Nelson, who hurried everyone into the meeting room and then excluded Creal.  Since Cretsinger was the undisputed decision maker regarding Creal's termination – not Nelson –the Saturday sales meeting testimony is immaterial.

     *b. Similarly Situated Employees Evidence*

Creal also seeks to support an inference of discrimination by presenting evidence of Defendants treating what he contends to be similarly situated, non-African-American employees, better than him.  Specifically, Creal contends that Springhill enforced its tardiness policy more strictly against him than the other salesman, all of whom were white.

To support these assertions Creal points to the testimonies of salesmen Javier Garay, Don Rhodes, and Michael Hanson.  Creal characterizes these testimonies as supporting his contention that Springhill's actual practice regarding tardiness prior to his termination on May 10 was "lax."  Creal contends based on these testimonies that, at least for the other salesmen besides himself, the written policy did not really apply so long as salespersons were performing well, and tardy or absent salespersons were allowed to leave a message with the receptionist rather than speak with a manager.

To begin with, the Court does not agree that these witnesses' testimonies establish that Springhill's tardiness policy was not really enforced.  Garay initially testified that late salesmen were

supposed to leave a message with a manager but could ask a trustworthy salesperson to relay a message to the manager. When asked about leaving a message with the receptionist, Garay answered, "I don't know. I never did. I don't know if you could or not. I mean, I guess you could if you wanted to, but, I mean – . . . . I didn't trust her, to be honest with you, but I mean- . . . ." And while Garay did agree when asked whether the late policy was more lax for salesmen selling a lot of cars, he explained that this meant such salespeople got "a break every now and then. Like if you're going to be five minutes late, you're on your way there. . . . But if you're going to be late for half an hour or – you know, the policy was you should call somebody, you know, call one of the managers." Hanson and Rhodes, for their parts, testified that it was permissible to leave a message on a manager's voice mail. No witness besides Creal testified that any salesmen ever left messages with the receptionist.

Thus, none of Creal's purported "similarly situated" evidence involves employees who were in fact similarly situated to Creal. To benefit from such evidence, an employment discrimination plaintiff must show that the comparator employee is directly comparable to the plaintiff in all material respects. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir.2004). In the Court's view, the material points of comparison with Creal need to include at least tardiness following prior warnings, failure to

speak with or leave a message for a manager, and the challenging of a manager's enforcement of rules.  Creal has failed to identify any employees who compare with Creal on any of these points and were not fired.  The closest comparator employee would seem to be Rhodes, but it is undisputed that Rhodes' tardiness problem greatly improved following his "counseling," which is a material difference between Rhodes and Creal.  Moreover, the fact that Rhodes, who is Caucasian, received tardiness "counseling" along with Creal means that (a) the flexibility of Springhill's lateness policy had limits and (b) Creal was not being singled out due to his race.

### *c. Pretext*

Creal contends that Defendants have proffered "shifting reasons" for his termination, thus suggesting that those proffered reasons are pretextual and that the real reason for his termination was his race.  Creal testified that Springhill initially refused to provide him with a written statement of the reasons for his termination.  Following this refusal, Creal received a notice from the Department of Employment Security denying his claim for unemployment benefits because "[t]he Claimant was discharged from Springhill Ford because he was late on March 10, 2005, with no compelling reasons.  He had prior warnings."  Creal contrasts Springhill's initial refusal and the unemployment notice with Defendants' interrogatory answers in this litigation, which state that "Plaintiff was terminated for misconduct and insubordination."

Creal also points out that Cretsinger testified that he did not fire Creal for being tardy but rather "because [Creal] reacted the way he did" when Cretsinger confronted him about having been tardy.

Viewed in the light most favorable to Creal, this evidence adds little to his overall circumstantial case of discrimination. In the employment discrimination context, pretext means that the employer's proffered reason is a lie. *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 754 (7th Cir.2006). And given that an employer can terminate an employee for multiple, legitimate reasons, the fact that the record contains more than one statement of why Creal was fired only helps Creal if those statements are inconsistent with one another or the underlying facts in such a way as to suggest a lie.

The Court does not find such indicia of dishonesty. Defendants' most direct statement of its reasons for terminating Creal is that Creal was terminated for "misconduct and insubordination." This is consistent with Cretsinger's testimony that he decided to fire Creal based on Creal's reaction when Cretsinger reprimanded Creal for being late. Creal argues that "misconduct and insubordination" is, however, inconsistent with the unemployment notice's statement that Creal was fired for being late after receiving prior warnings. But Creal ignores the unemployment letter's reference to "misconduct connected with the work," which is consistent Defendants' statement. In any case, the letter was

not issued by Defendants but instead at most reflects the unemployment agency's reporting of information provided to it by someone at Springhill.  Given that it is undisputed that Cretsinger, the sole decision maker on Creal's firing, was not the one responsible for communicating with the unemployment agency regarding Creal's termination, the letter's statement regarding tardiness is not inconsistent with Defendants' statement that Creal was fired for "misconduct and insubordination."  This is especially so given how intertwined the tardiness issue is with the May 10 incident in which Cretsinger fired Creal.

Finally, the Court also notes that Creal's reliance on what non-management Springhill employees have stated regarding their understandings of why Creal was terminated is unavailing.  Even if such employees understood Creal to have been terminated for a reason inconsistent with "misconduct and insubordination" (which does not appear to be the case), their understandings are not relevant without evidence that the decision maker communicated information to them inconsistent with the officially proffered reasons for termination.

### *2. The Indirect Method*

Under *McDonnell Douglas*, the employment discrimination plaintiff bears the burden of establishing a *prima facie* case of discrimination, which requires showing that:  (1) he or she was a member of a protected class; (2) he or she was meeting the

employer's legitimate job expectations; (3) he or she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case, the employer must articulate a legitimate, non-discriminatory reason for its employment action, and in response the plaintiff must prove that the employer's proffered non-discriminatory reason is a pretext for discrimination. *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

Creal's evidence fails under the indirect method of proof for many of the same reasons it fails under the direct method. Although Creal clearly satisfies the first and third requirements, he fails to establish the "legitimate expectations" and "similarly situated" requirements. He fails the "legitimate expectations" test because he (1) was tardy on multiple occasions, (2) was counseled by management about his tardiness, (3) was at least 45 minutes tardy on May 10, and (4) responded to Cretsinger's reprimand for tardiness on May 10 by challenging why Cretsinger was "riding" or "getting on" him and then questioning whether Cretsinger was singling him out because of his race. See discussion *supra*. Creal fails the "similarly situated" test because he has not identified any non-African-American employee who retained his job despite violating Springhill policy and being insubordinate towards a manager. See discussion *supra*. Since

Creal has failed to establish a *prima facie* case of race discrimination, this Court need not reach the issue of pretext. *See Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 531 (7th Cir. 2003).

### B. Retaliation

Both Title VII and Section 1981 prohibit an employer from discriminating against an employee because the employee has "opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a); *see also*, *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-404 (7th Cir. 2007) (noting the identity of proof requirements between Title VII and Section 1981 retaliation claims). Creal contends that his questioning during the May 10 incident of whether Cretsinger was "getting on him" because he is black constituted opposition of unlawful race discrimination, and that his firing was retaliation for this opposition. As with Creal's race discrimination claims, he may proceed under both the direct and indirect methods of proving retaliation. *Id.* at 404. Also as with his race discrimination claims, his evidence fails to satisfy either method of proof.

#### 1. Direct Method

Under the direct method, Creal must present direct or circumstantial evidence that he engaged in a statutorily protected activity and as a result suffered an adverse employment action. *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900,

902 (7th Cir. 2006). An employee alleging retaliation for opposing an unlawful employment practice need not prove that he opposed an action that *in fact* violated employment discrimination laws; he must, however, establish that he reasonably believed in good faith that he was opposing such an action. *Hernandez v. HCH Miller Park Joint Venture*, 418 F.3d 732, 737 (7th Cir. 2005). Additionally, even when an employee engages in such opposition, an employer's decision to discipline that employee does not violate anti-retaliation laws where the form of opposition is unreasonable. *Jennings v. Tinley Park Community Consol. School Dist. No. 146*, 864 F.2d 1368, 1372 (7th Cir. 1988). Thus, Creal must show not only that his accusation of Cretsinger was reasonable but that the manner in which he did it was reasonable.

Creal's evidence fails on both counts. First, as reflected in the Court's discussion of Creal's direct discrimination claim, the Court does not view Creal's accusation to be reasonable. On May 10, 2005, Creal had available to him very little reliable evidence that Cretsinger was reprimanding him because of his race. As recounted above, this evidence consisted of two race-conscious comments made more than six months prior, along with rumor and speculation from certain co-workers that Cretsinger had used the "N-word" before and that "they" were "out to get" Creal. Perhaps these "bits and pieces" of evidence could have supported a reasonable belief of discrimination if Cretsinger had simply

started picking on Creal with no other apparent motivation. But in light of the fact that Cretsinger was reprimanding Creal after Creal had arrived 45 minutes late, having already been counseled for tardiness, the Court does not find Creal's apparent concern that Cretsinger's reprimand was racially motivated to be reasonable.

Additionally, even if Creal's belief that he was being racially discriminated against had been reasonable, the form of his opposition is not entitled to protection. It is undisputed that the Cretsinger-Creal confrontation occurred in the middle of the Springhill show room and in front of other Springhill employees. According to Creal's testimony, Cretsinger reprimanded Creal after Creal arrived 45 minutes late, and Creal's response was to express irritation with Cretsinger "riding him" or "getting on him" and then accuse Cretsinger of racially discriminating against him. As this Court indicated during its discussion of Creal's direct discrimination claim, insubordination is a legitimate reason for terminating an employee. *Flores*, 182 F.3d at 515. The fact that Creal's insubordination partially took the form of what might otherwise have been protected activity did not deprive Cretsinger of the right to terminate Creal for it. *See id.* (collecting cases); *see also, Kahn v. U.S. Secretary of Labor*, 64 F.3d 271, 279 (7th Cir. 1995) ("We have consistently held that an employee's insubordination toward supervisors and co-workers, even when

engaged in a protected activity, is justification for termination.").

## 2. Indirect Method

Under the indirect method, Creal must show that after opposing Defendants' alleged discriminatory practice only he, and not any similarly situated employee who did not complain of discrimination, was subjected to a materially adverse action even though he was performing his job satisfactorily. *Humphries*, 474 F.3d at 404. Thus, as was the case with Creal's race discrimination claims, the indirect method of proving retaliation requires him to meet both the "similarly situated employees" element and the "satisfactory job performance" (*i.e.*, "legitimate job expectations") element. Creal is unable to make out a *prima facie* case of retaliation under the indirect method because, as noted above, he fails to establish that he was meeting Springhill's legitimate expectations and he has not identified any similarly situated employee who did not complain of discrimination and was retained.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **granted.**

**IT IS SO ORDERED.**

                                                Harry D. Leinenweber, Judge
                                                United States District Court

**DATE:** 10/19/2007